**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BRIAN PETTIS,** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 09-00388-KD-N** |
| **BOSARGE DIVING, INC.,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This action came before the court for a non-jury trial on October 5, 2010. Michael Huey and Dwain C. Denniston, Jr. appeared for plaintiff Brian Pettis and Gregory C. Buffalow and Mark Dowdy appeared for defendant Bosarge Diving, Inc.

Upon consideration of the documentary evidence submitted by the parties, testimony presented at trial, and all other pertinent portions of the record, the court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[1]

I. Jurisdiction

Subject matter jurisdiction exists over this cause of action by virtue of the Jones Act, 46 U.S.C. § 30104, and general maritime law pursuant to 28 U.S.C. § 1333.

II.      Factual and Procedural Background

Pettis worked for Bosarge Diving, Inc. as a deckhand, captain, apprentice diver, dive tender, and diver. On August 24, 2006, Pettis worked as a diver for Bosarge Diving, Inc. On August 25, 2006, Pettis was treated in the hyperbaric chamber at Springhill Memorial Hospital and released.

_____

[1] Pettis' motion to tax costs (doc. 201) and supplemental motion (doc. 220) are **denied**.

Pettis resumed diving for Bosarge Diving and was certified fit to dive on November 1, 2006. He continued to dive and work for Bosarge Diving until May 2007.

Subsequent to his termination, Pettis sought medical treatment for dizziness, nausea, and light-headedness which in December 2009 was diagnosed as vertigo. Pettis alleges that the decompression sickness of August 24, 2006, caused this damage, and as a result, he has continuous recurrence of these symptoms as well as memory problems, confusion, and insomnia. Pettis also alleges that he is no longer able to work as a diver.

On June 30, 2009, Pettis filed this maritime personal injury action against Bosarge Diving and amended his complaint on April 13, 2010 (doc. 109). Pettis alleges that his claims arise out of the Jones Act, 46 U.S.C. § 30104, *et seq*., and the General Maritime Law of the United States. Pettis brings Count One for negligence under the Jones Act alleging that he is a Jones Act seaman and that Bosarge Diving breached its duty to provide him a safe place to work. Pettis brings Count Two for unseaworthiness alleging that the OAL Xpress Skiff, owned and operated by Bosarge Diving, was unseaworthy because it failed to provide equipment, proper supervision and monitoring of his ascent. Pettis seeks compensatory, general and special damages, attorneys fees and costs, pre-judgment interest and post-judgment interest.

III.    Pettis' status as a Jones Act Seaman

The Jones Act states, in relevant part, that a "seaman injured in the course of employment . . . may elect to bring a civil action at law, . . . against the employer." 46 U.S.C. § 30104. The status of "seaman" is not defined in the Jones Act. Thus, the Act "leaves to the courts the determination of exactly which maritime workers are entitled to admiralty's special protection." Chandris, Inc. v. Latsis, 515 U.S. 347, 355, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). Also, the question of seaman status, "is a mixed question of law and fact." Harbor Tug & Barge Co. v. Papai, 520 U.S. 548, 554, 117 S.Ct. 1535 (1997).

However, "the key to seaman status is employment-related connection to a vessel in navigation[.]" Chandris, 515 U.S. at 357, 115 S.Ct. at 2184; Holmes v. Atlantic Sounding Co., Inc., 437 F.3d 441, 446 (5th Cir. 2006) ("The existence of a vessel is a fundamental prerequisite to Jones Act jurisdiction and is at the core of the test for seaman status.") (footnote omitted) (citation and internal quotations omitted).

A. Status of the 20' OAL Xpress

1. Findings of Fact

a. The Xpress was owned and controlled by defendant Bosarge Diving. (Trial testimony of Bosarge).

b. The Xpress is twenty feet long, approximately seven feet wide, made of aluminum, has a 60 horsepower engine, and a center control console but does not have a pilot house, cabin, or crew quarters (Trial testimony of Bosarge, Bosarge Diving company brochure, trial testimony of Pettis and Baria).

c. Bosarge Diving used the Xpress to transport divers to dive sites and as a launch for divers. (Id.) The Xpress was outfitted with an air supply to provide air to divers, pneumofathometer, pressure gauges, diver's umbilical cord, and dive radio. (Id.)

d. On August 24, 2006, Bosarge was the dive supervisor and Baria and Pettis were divers and dive tenders. They constituted the crew aboard the Xpress. (Id.)

e. Before the dive, Bosarge, Baria and Pettis boarded the Xpress and travelled by water approximately 1.3 miles to the dive site. (Id.)

f. During the first dive, the Xpress was tied to the pier and during the second dive the Xpress was tied to the M/V Madison Gail. (Id.)

g. The Xpress was not permanently affixed in any manner at the time of the dive or before the dive. (Id.)

h. The Xpress was not out of service in any manner at the time of the dive or before the dive.

(Id.)

2. Conclusions of Law

"The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. The Supreme Court in Stewart v. Dutra Const. Co., explained that "Section 3 requires only that a watercraft be 'used, or capable of being used, as a means of transportation on water' to qualify as a vessel." 543 U.S. 481, 495, 125 S.Ct. 1118, 1128 (U.S. 2005). In Crimson Yachts v. Betty Lyn II Motor Yacht, 603 F.3d 864 (11th Cir. 2010), The Eleventh Circuit explained the decision in Stewart as follows:

> In Stewart, the Supreme Court decided whether a person injured while working on a dredge called the Super Scoop could recover worker's compensation under the Jones Act, an act that protects only seamen. [ ] 543 U.S. at 485-86, 125 S.Ct. at 1122-23. The Stewart Court analyzed the term "vessel in navigation," because "the key to seaman status is employment-related connection to a vessel in navigation," Chandris, Inc. v. Latsis, 515 U.S. 347, 357, 115 S.Ct. 2172, 2184, 132 L.Ed.2d 314 (1995) (quotations omitted). The Stewart Court held that, although it was idle, with one scow at sea and the other without a working engine, the Super Scoop was a vessel in navigation because it "had not been taken out of service, permanently anchored, or otherwise rendered practically incapable of maritime transport." 543 U.S. at 496, 125 S.Ct. at 1128. The Court stated that in determining whether a watercraft constitutes a "vessel" under § 3, "[t]he question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." Id. (citation omitted).

Crimson Yachts, 603 F.3d at 874 (footnote omitted).

3. Analysis

The parties dispute whether the 20' OAL Xpress is a vessel. If it is not a vessel, then Pettis cannot be a Jones Act seaman. Bosarge Diving asserts that the Xpress is a diving platform or work platform not engaged in navigation and not subject to the perils of the sea (doc. 194, trial brief). Pettis asserts that the Xpress is a special purpose watercraft and therefore, a vessel as contemplated under the Jones Act (doc. 172, trial brief). At trial, testimony was adduced as to the facts and

4

circumstances surrounding the dive at issue, including the use and outfitting of the Xpress in connection with the dive.

Upon consideration of the facts adduced at trial and in the trial briefs, and applying the broad provisions of <u>Stewart</u>, the court finds that the Xpress was a watercraft "used . . . as a means of transportation on water." 1 U.S.C. § 3. The trial testimony establishes that the Xpress was used at all time by Bosarge Diving as a dive watercraft. [2] Further, the court finds that the Xpress was "in navigation", and had not been out of service, <u>see</u> <u>Crimson Yachts v. Betty Lyn II Motor Yacht 603 F.3d 864, 874 (11th Cir. 2010),</u> or permanently affixed, <u>see</u> <u>Hurst v. Pilings & Structures, Inc.</u>, 896 F. 2d 504 (11th Cir. 1990), such that it lost its character as a watercraft. <u>Stewart</u>, 543 U.S. at 494, 125 S.Ct. at 1127 ("A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again.") Accordingly, the court finds that the Xpress was a vessel in navigation as required for seaman status under the Jones Act.

B. <u>Pettis' duties and connection to vessel</u>

1. <u>Findings of fact</u>

a. Bosarge Diving, Inc. is a corporation which provides dive services to its customers and owns at least five vessels or watercrafts used for that purpose including the Xpress, the M/V Madison Gail, and the BDI Transporter. (<u>See</u> Bosarge Brochure, doc. 172-1; trial testimony of Bosarge)

b. Pettis was hired by Bosarge Diving in August 2005 as a deckhand and dive apprentice. Pettis worked continuously as a either a deckhand, captain, dive apprentice, dive tender, or diver

---

[2] There is no dispute of fact that the BDI Transporter and the M/V Madison Gail are vessels in navigation and that Pettis also worked on these vessels.

until he was terminated in May 2007. (Trial testimony of Bosarge, Baria, Pettis; doc. 171-1, p. 1)[3]

    c.  Pettis made his first dive in September 2005. (Trial testimony of Pettis)

    d. Pettis learned to dive on the job, obtained certification as a commercial diver, and continued to dive for Bosarge Diving until his termination in May 2007. (Id.; trial testimony of Pettis, Baria, Bosarge, and Ewing).

    e. Pettis worked for Bosarge Diving on August 24, 2006, and was assigned to the Xpress at the time of the dive from which he claims injury. (Id.)

    f. Pettis' job duties on the M/V Madison Gail rotated and he served as captain, deckhand, dive tender, and diver. (Trial testimony of Pettis)  When Pettis was assigned to the BDI Transporter, another Bosarge vessel, he captained that vessel. (Trial testimony of Pettis)

    g. At times, Pettis assisted with loading and unloading the vessels.  However, Pettis spent the majority of his time working on the vessels. (Trial testimony of Pettis and Bosarge)

    h. Pettis never stayed overnight on the Bosarge Diving vessels. (Trial testimony of Pettis)

    2. Conclusions of law

    In Chandris v. Latsis, 515 U.S. 347, 115 S. Ct. 3172 (1995), the Supreme Court identified two factors for determining whether an employee was a seaman under the Jones Act:  "First, . . . an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission," and "[s]econd, and most important for our purposes here, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." Id. at 515 U.S. 368, 115 S. Ct. at 2189 (internal citations, quotations and brackets omitted).   The Court explained its decision as follows:

---

[3] ". . . Brian was hired on as a deck/hand tender.  He wanted to learn the ropes on diving.  I utilized him on our crewboat runs, our supply runs to vessels and in Bayou Casotte as well as a lot of dive jobs." (doc. 171-1, p. 1, Bosarge deposition).

We have said that, in giving effect to the term "seaman," our concern must be "to define the meaning for the purpose of a particular statute" and that its use in the Jones Act "must be read in the light of the mischief to be corrected and the end to be attained." . . . . Giving effect to those guiding principles, we think that the essential requirements for seaman status are twofold. First, as we emphasized in [McDermott Int's Inc., v. Wilander, 498 U.S. 355, 111 S.Ct. 807 (1991)], "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.'". . . . The Jones Act's protections, like the other admiralty protections for seamen, only extend to those maritime employees who do the ship's work. But this threshold requirement is very broad: "All who work at sea in the service of a ship" are *eligible* for seaman status. . . .

Second, and most important for our purposes here, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature. The fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea. See 1B A. Jenner, Benedict on Admiralty § 11a, pp. 2-10.1 to 2-11 (7th ed. 1994) ("If it can be shown that the employee performed a significant part of his work on board the vessel on which he was injured, with at least some degree of regularity and continuity, the test for seaman status will be satisfied" (footnote omitted)). . . . . . .

. . . The principal formulations employed by the Courts of Appeals-- "more or less permanent assignment" or "connection to a vessel that is substantial in terms of its duration and nature"--are simply different ways of getting at the same basic point: The Jones Act remedy is reserved for sea-based maritime employees whose work regularly exposes them to "the special hazards and disadvantages to which they who go down to sea in ships are subjected." [ ]  Indeed, it is difficult to discern major substantive differences in the language of the two phrases.  In our view,  "the total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relation to the navigation of vessels and the perils attendant thereon." . . .  The duration of a worker's connection to a vessel and the nature of the worker's activities, taken together, determine whether a maritime employee is a seaman because the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time. . . .

Generally, the Fifth Circuit seems to have identified an appropriate rule of thumb for the ordinary case: A worker who spends less than about 30 percent of his time in the

service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases. As we have said, "[t]he inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it." . . .

On the other hand, we see no reason to limit the seaman status inquiry, as petitioners contend, exclusively to an examination of the overall course of a worker's service with a particular employer. [ ] When a maritime worker's basic assignment changes, his seaman status may change as well. . . . For example, we can imagine situations in which someone who had worked for years in an employer's shoreside headquarters is then reassigned to a ship in a classic seaman's job that involves a regular and continuous, rather than intermittent, commitment of the worker's labor to the function of a vessel. Such a person should not be denied seaman status if injured shortly after the reassignment, just as someone actually transferred to a desk job in the company's office and injured in the hallway should not be entitled to claim seaman status on the basis of prior service at sea. . . .

Chandris, Inc., 515 U.S. at 368-372, 115 S.Ct. at 2189-2192 (italics in original) (internal citations omitted).

In Harbor Tug and Barge Co. v. Papai, the Court further explained the substantial connection requirements and stated that

[f]or the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea. This will give substance to the inquiry both as to the duration and nature of the employee's connection to the vessel and be helpful in distinguishing land-based from sea-based employees.

520 U.S. at 555, 117 S.Ct. at 1540.

3. Analysis

Examining Pettis' overall work duties, the court finds that his duties contributed to both the function and the accomplishment of the mission of the vessel Xpress and the other vessels, including the BDI Transporter and the M/V Madison Gail, which were owned and controlled by Bosarge Diving, and therefore, he has met the first element for seaman status. At all times, the function of the Xpress was to serve as a dive watercraft for Bosarge Diving and it was specifically

equipped for that function. The overall mission of the Bosarge Diving Fleet was to provide dive services and supply services for the customers of Bosarge Diving. By working as a deckhand, dive tender, or diver on the Xpress, Pettis contributed to both the function and the mission of the Xpress and by working as a deckhand, apprentice diver, diver, dive tender, and captain on other vessels in the Fleet, Pettis contributed to both the function and mission of the Fleet. At the time of the dive at issue, the mission of the Xpress was to recover five-gallon barrels which were dropped during an attempt to load the M/V Madison Gail. Since Pettis was retrieving barrels intended for loading on the M/V Madison Gail, his duties also contributed to the function and accomplishment of the mission of that vessel. A seaman need not "aid in navigation or contribute to the transportation of the vessel, but a seaman must be doing the ship's work." <u>McDermott Int'l Inc., v. Wilander</u>, 498 U.S. 337, 355, 111 S.Ct. 807 (1991). "This threshold requirement is very broad: 'All who work at sea in the service of a ship' are *eligible* for seaman status." <u>Chandris</u>, 515 U.S. at 368, 115 S.Ct. 2172 (quoting <u>Wilander</u>, 498 U.S. at 354, 111 S.Ct. at 817) (italics in original).

As to the second element, the court finds that Pettis has presented sufficient evidence to establish that he has a connection to the Xpress and the Bosarge Diving Fleet which is substantial in terms of both its duration and its nature. Pettis worked for Bosarge Diving from August 2005 through May 2007, as either a deckhand, captain, apprentice diver, dive tender, or diver. Moreover, the facts before the court establish that Pettis spent greater than 30 percent of his time in service of the Bosarge Diving Fleet including the Xpress[4] albeit not all of that time was spent as a diver, and therefore, his connection with the Fleet was substantial in duration. <u>Chandris</u>, 515 U.S. at

---

[4] The "thirty percent guideline applies to either an 'identifiable group' of vessels or a single vessel. However, if more than a single vessel is involved, the vessels must be an 'identifiable fleet' or a finite group of vessels under common ownership or control." <u>Landry v. Specialty Diving of Louisiana, Inc.</u>, 299 F.Supp.2d 629, 633 (E.D. La. 2003) (quoting <u>Roberts</u>, 266 F.3d at 375-376). There is no dispute of fact that Bosarge Diving owns a fleet of vessels.

372, 115 S.Ct. at 2192 (1995) ("A worker who spends less than 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act."); cf. Guarascio v. Drake Associates Inc., 2008 WL 4222034, 3, n.3 (S.D.N.Y. Sept. 15, 2008)[5] ) (denying summary judgment, declining at that time to apply a divers' exception to the 30 percent requirement, and noting that the "Third Circuit and the Fifth Circuit have found that commercial diving is inherently 'maritime in nature as it cannot be done on the land[]'"and that "[i]f all of Mr. Guarascio's diving hours were counted as 'Jones Act' time (including his dives from land or a pier), he would certainly qualify as a seaman under the Jones Act.") (citing Foulk v. Donjon Marine Co., Inc., 144 F .3d 252, 259 (3d Cir. 1998) (citing Wallace v. Oceaneering Int'l, 727 F.2d 427-36 (5th Cir.1984)); id. ("[T]ime spent on a crew boat in transit" and "working on the Drake dry-docked [dive] vessel" might apply in calculating the 30 percent requirement).

Second, as to whether Pettis' connection is substantial in "nature", the nature of Pettis' work as a deckhand, captain, apprentice diver, dive tender, or diver on a Bosarge Diving vessel or watercraft, rendered him a "crew member" on that vessel or watercraft. See Roberts v. Cardinal Servs., 266 F.3d 368, 374 (5th Cir. 2001) ("In Chandris, Inc. v. Latsis, the Supreme Court reiterated that 'the Jones Act and the LHWCA are mutually exclusive compensation regimes,'and that the LHWCA's reference to 'a master or member of a crew' is 'a refinement of the term "seaman" in the Jones Act."); id. at 377 ("the Jones Act remedy is reserved for sea-based maritime employees whose work regularly exposes them to 'the special hazards and disadvantages to which they who go to sea in ships are subjected.'). That Pettis claims an injury related to a dive does not render irrelevant the

_____

[5]  Guarascio was "hired as a commercial diver, but performed a variety of assignments for Drake, including construction, dock building, maintenance, diving and dive tending. Some of Mr. Guarascio's work at Drake required that he work on or from a vessel, or be transported to a work site on a boat. Plaintiffs contend that Mr. Guarascio's work also involved 'crewing' on Drake's fleet of vessels." Guarascio, 2008 WL 4222034 at 1.

fact that he also had other duties while employed by Bosarge Diving. "It is not the employee's particular job that is determinative, but the employee's connection to a vessel." McDermott Intern., Inc. v. Wilander, 498 U.S. 337, 354, 111 S.Ct. 807, 817 (1991).

Therefore, the court has considered the "context of his entire employment" – deckhand, captain, apprentice diver, dive tender, diver – and finds that his connection to the Xpress and to the Bosarge Diving Fleet is substantial in terms of its nature. See In re Williams Marine Const. and Services, Inc., 350 F.Supp.2d 975, 986 (M.D. Fla. 2004) ("In other words, courts should examine the claimant's overall job assignments as they existed at the time of the injury to determine whether there is sufficient connection to a vessel in navigation, without focusing solely on the specific activity in which the employee was engaged at the time of his injury.") (citations omitted); see also Ryan v. U.S., 331 F.Supp.2d 371, 378 (D.Md. 2004) ("Ryan's diving duties necessitated that he not only spend time onboard the dive boat to be in a position to provide rescue services, but his duties also required that he perform creditable service on shore, e.g., outfitting the boat and caring and maintaining the diving equipment. It is appropriate to take into consideration not only the work that Ryan actually performed on the dive boat, but, as well, the work he performed on shore in relation to the diving mission.") (citing Barrett v. Chevron USA, Inc., 781 F.2d 1067, 1075 (5th Cir. 1986) ("[I]f the employee's regularly assigned duties require him to divide his time between vessel and land (or platform) his status as a crew member is determined 'in the context of his entire employment' with his current employer.").

Therefore, the court finds that Pettis' connection to the vessels owned by Bosarge Diving was substantial in duration and nature.[6] Accordingly, the court finds that Pettis was a seaman at the

_____

[6] In an attempt to distinguish Pettis' work from one who goes to sea, Bosarge Diving also argues that the Xpress stays in harbors or protected waters, or near piers or wharves or the shore. However, this argument is of no consequence to Pettis' status as a seaman. See In re Endeavor Marine, Inc., 234 F. 3d 287, 292 n.3 (5th Cir. 2000) (finding that "the district court incorrectly (Continued)

time of his alleged injury.

IV.    Negligence under the Jones Act and Unseaworthiness

A. Findings of fact

1. Section 197.402, captioned "Responsibilities of the person-in-charge", of Title 46 of the

Code of Federal Regulations for the United States Coast Guard applies to commercial diving

operations and states as follows:

(a) The person-in-charge shall—

(1) Be fully cognizant of the provisions of this subpart;

(2) Prior to permitting any commercial diving operation to commence, have--

(i) The designation of the diving supervisor for each diving operation as
required by § 197.210;

(ii) A report on--

(A) The nature and planned times of the planned diving
operation; and

(B) The planned involvement of the vessel or facility, its
equipment, and its personnel in the diving operation.

46 C.F.R. § 197.402(a).

2. Section 197.404, captioned "Responsibilities of the diving supervisor", of Title 46 of the

Code of Federal Regulations for the United States Coast Guard applies to commercial diving

operations and states as follows:

(a) The diving supervisor shall--

(1) Be fully cognizant of the provisions of this subpart;

(2) Be fully cognizant of the provisions of the operations manual
required by § 197.420;

_____

concluded that Baye is not a Jones Act seaman merely because his duties do not literally carry him
to sea" and noting that "Baye's duties do place him on the brown waters of the Mississippi River.").

(3) Insure that diving operations conducted from a vessel or facility subject to this subpart meet the regulations in this subpart;

(4) Prior to the commencement of any commercial diving operation, provide the report required by § 197.402 to the person-in-charge;

(5) Coordinate with the person-in-charge any changes that are made to the report required by § 197.402; and

(6) Promptly notify the person-in-charge of any diving related casualty, accident, or injury.

(b) The diving supervisor is in charge of the planning and execution of the diving operation including the responsibility for the safety and health of the dive team.

46 C.F.R. § 197.404

3. Section 197.318, captioned "Gages and timekeeping devices", of Title 46 of the Code of Federal Regulations for the United States Coast Guard applies to commercial diving operations and states as follows:

(a) A gage indicating diver depth must be at each dive location for surface-supplied dives.

(b) A timekeeping device must be at each dive location.

46 C.F.R. § 197.318.

4. Section§ 197.458, captioned "Gages and timekeeping devices", of Title 46 of the Code of Federal Regulations for the United States Coast Guard applies to commercial diving operations and states as follows:

The diving supervisor shall insure that--

(a) Each depth gage and timekeeping device is tested or calibrated against a master reference gage or time-keeping device every 6 months;

(b) A depth gage is tested when a discrepancy exists in a depth gage reading greater than 2 percent of full scale between any two gages of similar range and calibration;

(c) A timekeeping device is tested when a discrepancy exists in a timekeeping device reading greater than one-quarter of a minute in a 4-hour period between any two timekeeping devices; and

(d) Each depth gage and timekeeping device is inspected before diving operations are begun.

46 C.F.R. § 197.458 .

5. Section 197.210, captioned "Designation of diving supervisor", of Title 46 of the Code of Federal Regulations for the United States Coast Guard applies to commercial diving operations and states as follows:

The name of the diving supervisor for each commercial diving operation shall be-

(a) Designated in writing; and

(b) Given to the person-in-charge prior to the commencement of any commercial diving operation.

46 C.F.R. 197.210.

6. Section 197.410, captioned "Dive procedures", of Title 46 of the Code of Federal Regulations for the United States Coast Guard applies to commercial diving operations and states, in relevant part, as follows:

(i) The physical condition of the diver is checked by--

(A) Visual observation; and

(B) Questioning the diver about his physical well-being;

46 C.F.R. § 197.410(a)(7).

7. Section 197.204, captioned "Definitions", of Title 46 of the Code of Federal Regulations for the United States Coast Guard applies to commercial diving operations and states, in relevant part, as follows:

*Timekeeping device* means a device for measuring the time of a dive in minutes.

46 C.F.R. § 197.204 (italics in original).

8. Section 197.482, captioned "Logbook entries", of Title 46 of the Code of Federal Regulations for the United States Coast Guard applies to commercial diving operations and states,

in relevant part, as follows:

(a) The person-in-charge shall insure that the following information is recorded in the logbook for each commercial diving operation: . . .

(7) Maximum depth and bottom time for each diver.

46 C.F.R. § 197.482.

9. Section 1910.423, captioned "Post-dive procedures", of Title 29 of the Code of Federal Regulations for the Occupational Safety and Health Administration (OSHA)[7] applies to commercial diving operations and states as follows:

(a) General. The employer shall comply with the following requirements which are applicable after each diving operation, unless otherwise specified.

(b) Precautions.

(1) After the completion of any dive, the employer shall:

(i) Check the physical condition of the diver;

(ii) Instruct the diver to report any physical problems or adverse physiological effects including symptoms of decompression sickness;

(iii) Advise the diver of the location of a decompression chamber which is ready for use; and

(iv) Alert the diver to the potential hazards of flying after diving.

. . .

(d) Record of dive.

(1) The following information shall be recorded and maintained for each diving operation:

(i) Names of dive team members including designated person-in-charge;

(ii) Date, time, and location;

---

[7] The Occupational Safety and Health Act of 1970, 84 Stat. 1590, as amended, 29 U.S.C. § 651, *et seq.*

(iii) Diving modes used;

(iv) General nature of work performed;

(v) Approximate underwater and surface conditions (visibility, water temperature and current); and

(vi) Maximum depth and bottom time for each diver.

29 C.F.R. § 1910.423.

10. Section 9-6.2.2 of Chapter Nine of the United States Navy Diving Manual, captioned

"Travel Rate Exceeded" states as follows:

On a Standard Air Dive, if the rate of ascent is greater than 30 fpm, STOP THE ASCENT, allow the watches to catch up, and then continue ascent. If the stop is arrived at early, start the stop time after the watches catch up.

(Exhibit 7, p. 19 of 22) (emphasis in original).

11. The following sections of the Consensus Standards for Commercial Diving and

Underwater Operations of the Association of Diving Contractors International, apply to commercial

diving operations and provide as follows:

a. "Personnel Requirements – General . . ." require as follows:

Knowledge and skills gained through a combination of formal training and/or Experience . . .

Association of Diving Contractors International, Consensus Standards for Commercial Diving and

Underwater Operations § 2.1.1 (5th ed. 2004); (Defendant's Exhibit 36).

b. "Personnel Requirements General . . . " require as follows:

For persons engaged as divers or otherwise exposed to hyperbaric conditions, physical qualifications for such activities must be met as outlined in Paragraph 2.8 Medical Requirements, and detailed in Paragraph 2.9 entitled Medical Standards and Recommendations. Such physical qualifications must be documented on an Association of Diving Contractors International Medical History and Physical Examination Form, or equivalent. Id., at § 2.1.3.

c. "Entry-Level Qualifications" require as follows:

. . . The entry-level Tender/Diver satisfies the minimum entry level qualifications of Diving Proficiency, Technical Proficiency, and Experience by successfully completing a formal course of study. The Tender/Diver must also complete the requirements of Paragraph 2.1.3. . . .

Id., at § 2.2.

      d.  "Commercial Diver, ROV Personnel, and Diver Medical Technician Certification Qualification  . . ." explains as follows:

Note: The U.S. Department of Labor (OSHA) considers an employer to be in compliance with the Code of Federal Regulations if documentation shows that the diver completed training to the appropriate level (i.e., surface-supplied air or surface-supplied mixed gas) at a commercial diving school within a particular state, a military school, federal school, or an Association of Commercial Diving Educators (ACDE) accredited school.

. . .

OSHA considers an employer to be in compliance with the diver training requirements of the Code of Federal Regulations for any employed diver with a valid "ADCI Commercial Diver Certification Card" for the appropriate training level.

Id., at § 3.1.2; (Defendant's Exhibit 23).

      e. "Certification" requires that

Certification cards issued by recreational agencies are not recognized as qualifying an individual to perform commercial diving activities in the absence of additional formal commercial diving training from an accredited source.

Id., at § 3.1.3.

      f. "Diving Supervisor"  shall

Maintain a depth, bottom time, and breathing mix profile at the dive location for each diver during the dive  . . .

Id., at § 4.25.1.

      g.  In regard to "Air Diving"  the following is required:

1. . . . a. Surface-Supplied Air Diving 0-80 fsw (0-24.39m) with no decompression:  . . .

<u>Id.</u>, at § 4.28.4.

        h. "Minimum Equipment" requires

. . . 2 time-keeping devices . . .

<u>Id.</u>, at § 4.28.4.3.a.

        i. "Planning and Assessment" requires that

The planning of a diving or underwater operation shall include a Job Safety Analysis (see Page 4-11) of the safety and health aspects of the following:

• Diving mode

• Surface and underwater conditions and hazards

• Breathing gas supply (including reserves)

• Thermal protection

• Diving equipment and systems

• Dive team assignments and physical fitness of dive team members including any conditions which may render an individual dive team member unfit to dive. Competency of assigned personnel to perform necessary tasks and responsibilities.

• Repetitive dive designation or residual inert gas status of dive team members

• Decompression and treatment procedures (including altitude corrections)

• Emergency procedures

<u>Id.</u>, § 4.4.

        j. "Post-Dive Procedures" require as follows:

1. After the completion of each dive the diver shall:

• Be questioned as to his physical condition

• Be instructed to report any physical problems or adverse physiological effects including symptoms of decompression sickness or gas embolism

• Be advised of the location of an operational decompression chamber

• Be alerted to the potential hazards of flying after diving

• When diving, be alerted to the potential hazards of traveling to higher elevations from the dive site

Id., at § 4.7.

        k.  In regard to a "Reportable Incident", the following applies:

The basic guideline for this category is to decide whether the incident required treatment by a licensed physician.

Id., at § 9.4.2.

        12.  Pettis was employed by Bosarge Diving in August 2005. (Trial testimony of Pettis)

Pettis worked as a deckhand, captain, dive tender, and diver for Bosarge Diving. (Id.)  Pettis learned

how to work as a dive tender and diver by observation of other employees. (Id.)  Pettis' first dive for

Bosarge Diving occurred in September 2005. (Id.)  Pettis had not received a physical to determine

his fitness to dive before beginning to dive, nor had he received any formal training in commercial

diving. (Id.)

        13. On August 24, 2006, Pettis performed two dives for Bosarge Diving. (Id.)   The first

dive was approximately 80 minutes at a maximum depth of approximately 45 feet.[8]  (Joint Exhibit

1, PET00436, surface air dive sheet)  The second dive was for 40 minutes at a maximum depth of

approximately 45 feet. (Id., PET000436, surface air dive sheet).

        14.  Brian Bosarge, the person-in-charge and dive supervisor, and Scott Baria, the dive

tender, used a cell phone to time Pettis' bottom time and ascent.  The cell phone did not have a

reading in seconds.  The Xpress did not have a time piece with a reading for seconds. (Trial

testimony of Bosarge and Baria)

        15.  The scratch log and surface air dive sheets provide the most reliable basis available for

_____

[8] Pettis testified that he only recalls one dive and thought it to be for three hours; however, the court finds his testimony unreliable as to the number of dives in light of the scratch log.

determining the number and the duration of the dives on August 24, 2006.  (Joint Exhibit 1, at PET000435, 436, surface air dive sheets; Joint Exhibit 1, PET000431, scratch log; Plaintiff's Exhibit 7, p. 22, scratch log).  However, the court finds that the scratch log and surface air dive sheets are an estimate, rather than exact times, as the method of keeping time, i.e., cell phone, did not provide a mechanism for exact timekeeping. (Id.)  Also, the surface air dive sheets were not filled out until three days after the dive. [9] (Id.)

16.  The dive operation on August 24, 2006 was planned by Bosarge.  The purpose of the dive operation was to recover barrels that had been dropped in Bayou Cassotte.  The dives were surface air supply dives which involved using an umbilical cord to provide air to the diver.  Pettis wore a helmet with a two-way radio which provided for communication with topside.  Because visibility was very low, Baria directed Pettis' movements. (Trial testimony of Bosarge and Baria)

17.  In a surface supply air dive, the dive tender controls the ascent rate of the diver and is responsible for monitoring the depth and duration of the dive. (Id.)  Baria, a certified commercial diver, determined the rate of ascent by using the markings on the umbilical cord and by relying on his experience in determining the appropriate rate of ascent. (Id.)

18.  On the first dive, Pettis ascended approximately six times bringing found barrels to the surface.  On his sixth ascent he surfaced completely and had a surface interval of approximately 100 minutes.  The depth from which the ascents occurred is unknown; pneumofathometer depth readings were not consistently monitored or recorded.  (Id.; trial testimony of Pettis)[10]  The surface air dive sheet indicates that it took one minute to ascend.  The court finds this to be an unreliable

[9]  The court finds the report prepared by Baria on March 27, 2008, in anticipation of litigation, to be unreliable. (Joint Exhibit 1, PET000400-405)

[10] The court relies on Pettis' testimony that only one pneumofathometer depth reading was called out to him. (Trial testimony of Pettis)

ascent estimate.

19.  On the second dive, a rope was used to raise the barrels; this alleviated the need for the diver to ascend with each barrel.  The final ascent occurred from an unknown depth and was recorded to have taken one minute.  This estimate of ascent is also unreliable. (Id.)

20.  Baria was the diver for the third dive which lasted approximately 85 minutes.  (Joint Exhibit 1, PET000431, scratch log)

21.  When the third dive was completed sometime after midnight on August 25, 2006 and the crew reached shore, Pettis complained of pain in his shoulder.  Bosarge instructed Pettis to go home and rest. (Trial testimony of Pettis)

22.  On the drive home, Pettis experienced intense pain and pulled to the side of the road. Thereafter he contacted his girlfriend, Dashia Lofton, to pick him up as he was unable to drive. (Id.; trial testimony of Lofton)

23.  Lofton picked up Pettis and took him home. (Id.)   Pettis was unable to sleep because of the pain and early on the morning of August 25, 2006, went to the Providence Hospital emergency room. (Id.)

24. After informing the hospital staff of his complaints and the previous day's dives, Pettis was transferred to Springhill Hospital where a hyperbaric chamber was available.  Pettis was treated in the hyperbaric chamber and his pain subsided.  (Id.; Joint Exhibit 6b, Emergency Room Record).

25.  Based on the medical records and testimony, the court finds that as a result of the dives on August 24, 2006, Pettis experienced decompression sickness on August 25, 2006.  The decompression sickness symptoms subsided with hyperbaric treatment. (Joint Exhibit 6b, Emergency Room Record; Dr. Damien Collins' deposition testimony p. 44; Dr. Keith Van Meter

deposition testimony p. 68-69, 95; Dr. Richard Moon deposition testimony p. 21).[11]

26.  Pettis informed Bosarge of his hospital visit, but told Bosarge that he had not experienced decompression sickness and that the hospital had overreacted and put him in the hyperbaric chamber. (Trial testimony of Bosarge)

27.  In November 2006, Pettis received a physical to determine his fitness to dive.  Pettis failed to disclose his previous decompression sickness or any complaints of dizziness.  Pettis was certified fit to dive. (Id.)

28.  Pettis resumed diving on September 13, 2006 and continued to dive until May 2007. (Joint Exhibit 2)   Pettis did not inform Bosarge Diving supervisory personnel of any problems he experienced on subsequent dives.  (Trial testimony of Bosarge, Baria and Mike Ewing)

29.  Any subsequent decompression sickness symptoms were not related to the August 24, 2006 dive. (Dr. Richard Moon deposition, p. 28-29, 34).

30.  Pettis was paid between $125 - $200/day depending on whether he was working as a deckhand or a diver.  In 2006, Pettis earned approximately $51,000 working for Bosarge Diving. (Trial testimony of Pettis and Social Security Earning Statement, Joint Exhibit 26 )

31.  In March 2007, Pettis obtained his commercial dive license. (Trial testimony of Pettis)

32.  In May 2007, Pettis was terminated from Bosarge Diving for poor attendance. (Id.)

33.  On May 30, 2007, Pettis visited Dr. Harry Studdard with complaints of pain related to diving.  (Joint Exhibit 6, PE100032)

34.  In early 2008, Pettis obtained his 100 ton Captain License. (Trial testimony of Pettis;

---

[11]  The court finds Dr. Moon's testimony to be reliable expert testimony in the area of undersea and hyperbaric medicine.  Accordingly, Pettis' motion to strike Dr. Moon's testimony, brought pursuant to Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). (doc. 167) is **denied.**  The court also finds Dr. Brett Hart's testimony to be reliable expert testimony in the area of undersea and hyperbaric medicine.  Accordingly, Pettis' motion to strike Dr. Hart's testimony, brought pursuant to Daubert (doc. 167), is **denied.**

Joint Exhibit 25, Merchant Marine records)  Pettis is fit and able to perform work as a captain of a vessel or as a deckhand.  (Trial testimony of Pettis)

35.  The median wage in the Mobile, Alabama area for a captain on a 100 ton vessel is $67,000.  (Trial testimony of Douglas Miller, M.S., Licensed Professional Counselor)[12]  A survey of local companies indicate that the going rate for captain of a 100 ton vessel is between $300 - $325/day and for a first mate $275/day.  (Id.)

36.  In December 2009, Pettis visited Dr. Mark Gacek with complaints of dizziness.  Dr. Gacek diagnosed episodic vertigo and very mild hearing loss.  (Trial testimony of Dr. Gacek)

B. Negligence Per Se

The Jones Act incorporates the terms of the Federal Employers' Liability Act (FELA) and FELA provides for a cause of action for negligence *per se* where the employer violates a statute or regulation without regard for whether the employer was negligent, or whether there was connection between the purpose of the statute or regulation and the injury sustained by the seaman, or whether the seaman was within the class of persons whom the statute or regulation was meant to protect. See Kernan v. American Dredging Co., 355 U.S. 426, 431, 78 S.Ct. 394, 397 (1958) ("The question for our decision is whether, in the absence of any showing of negligence, the Jones Act-which in terms incorporates the provisions of the FELA-permits recovery for the death of a seaman resulting from a violation of a statutory duty.  We hold that it does.").

The "[f]ive elements of a Jones Act negligence *per se* claim are the following: (1) a violation of Coast Guard regulations, (2) the plaintiff's membership in the class of intended beneficiaries of the regulations, (3) an injury of a type against which the regulations are designed to

---

[12] The court finds Miller's testimony to be reliable expert testimony in the field of vocational rehabilitation services.  Accordingly, Pettis' motion to strike Miller's testimony, brought pursuant to Daubert, 509 U.S. 579, (doc. 167) is **denied.**

protect, (4) the unexcused nature of the regulatory violation, and (5) causation." Smith v. Trans-World Drilling Co., 772 F.2d 157, 160-161 (5th Cir. 1985) (finding that Trans-World's failure to install a railing along an exhaust pipe from which Smith fell constituted negligence *per se*) (citing Reyes v. Vantage S.S. Co., Inc., 558 F.2d 238, 242-44 (5th Cir. 1977) ( Reyes I), modified, 609 F.2d 140 (1980) (Reyes II)).   As stated, "there must be a causal connection between the injury alleged and the violation in order to establish negligence per se under the Jones Act." Florida Marine Transporters, Inc. v. Sanford, 255 Fed.Appx. 885, 888 (5th Cir. 2007) citing Park v. Stockstill Boat Rentals, Inc., 492 F.3d 600, 603 n. 2 (5th Cir. 2007); In re Atlantic Marine, Property Holding Co., Inc., 2008 WL 3906112, 6 (S.D. Ala. August 19, 2008) ("Even if Bender did not comply with the Coast Guard's order, negligence per se may not be applicable. "[T]here must be a causal connection between the injury alleged and the violation in order to establish negligence per se ...""")) (citation omitted).   In other words, the "statutory violation must be a contributory and proximate cause of the accident." In re Atlantic Marine, 2008 WL 3906112 at 6 (citing In re Mid-South Towing Co., 418 F.3d 526, 534 (5th Cir. 2005)).  However,  even the slightest contribution will suffice. MacDonald v. Kahikolu Ltd., 442 F.3d 1199, 1203 (9th Cir. 2006) ("Thus, under the Jones Act, the common-law concepts of foreseeability and risk of harm are not applicable where the employer violates a federal statute or a Coast Guard regulation, if such conduct in whole or in part caused injury. We [have] held  [ ] that " 'an employee is entitled to recover damages if the employer's negligence played *any* part in producing the injury, no matter how slight.' ") (citations omitted) (emphasis in original).

Additionally, the burden is upon the defendant employer to establish that the statutory or regulatory violation "could not have" contributed to the injury. Superior Const. Co., Inc. v. Brock, 445 F.3d 1334, 1340 (11th Cir. 2006) ("In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it

could not have been.") (quoting The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148

(1873)). "The Pennsylvania Rule 'is not a rule of liability, but shifts the burden of proof as to

causation. This burden is strict, but it is not insurmountable.'" Id. quoting Orange Beach Water,

Sewer and Fire Prot. Auth v. M/V Alva, 680 F.2d 1474, 1381 (11th Cir. 1982).  The defendant must

show by "clear and convincing" evidence that the statutory violation "could not have been a

proximate cause of the accident." In re Backcountry Outfitters, Inc.,  2008 WL 516792, 6 -7  (N.D.

Fla. February 22, 2008) (citing Cliffs-Neddrill v. M/T Rich Duke, 947 F.2d 83, 86 (3d Cir.1991);

Trinidad Corp. v. S.S. Keiyoh Maru, 845 F.2d 818, 825 (9th Cir.1988). "The Pennsylvania Rule

presumption may also be rebutted by demonstrating that the accident would have occurred despite

the statutory violation." Id. (citation omitted)

Although The Pennsylvania, involved a collision, the burden shifting provision has been

applied beyond that context where a statutory or regulatory violation has occurred. See Lanza v.

Schriefer, 2010 WL 2754327, 4 (S.D. Fla. 2010) (faced with a factual issue over the size and

location of a dive flag and whether such complied with Coast Guard regulations, the court denied

summary judgment and recognized that "one of the requirements of applying this burden shifting

rule is an actual violation of a statutory rule"); In re Backcountry Outfitters, Inc.,  2008 WL 516792,

6 -7  (N.D. Fla. February 22, 2008) (addressing the claims of a recreational fisherman thrown from

a boat during a chartered fishing trip and finding that the "Pennsylvania Rule has been expanded

beyond collision cases to apply to any 'statutory violator who is a party to a maritime accident.'")

(citing Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1472 (5th Cir. 1991);

Complaint of Nautilus Motor Tanker Co., Ltd., 85 F.3d 105, 113 (3d Cir. 1996); United States v.

Nassau Marine Corp., 778 F.2d 1111, 1116 (5th Cir. 1985)).

Also, under the FELA which has been incorporated into the Jones Act, the contributory

negligence of an employee should not be considered where the employer violated a statute or

regulation enacted to protect the employee. See 45 U.S.C. § 53 (" . . . the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: *Provided*, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.") (italics in original). Therefore, any damage award should not be reduced based upon the plaintiff's comparative fault when the injury incurred is the injury which the statute or regulation was designed to prevent. See Fuszek v. Royal King Fisheries, Inc., 98 F.3d 514, 517 (9th Cir. 1996) (holding that the district court erred by reducing the damage award for comparative negligence and that the "ship was in unexcused violation of a Coast Guard safety regulation that was designed not only to protect members of the class to which Fuszek belonged, but also to prevent the type of injury he sustained.").

The plaintiffs have submitted numerous regulations (see *supra*, Findings of Fact 1-10) as well as standards from the Association of Diving Contractors and the Navy manual. (see *supra*, Findings of Fact 11-12)  The standards cannot be relied upon to establish negligence per se.  See Melerine v. Avondale Shipyards, Inc., 659 F.2d 706, 713 (5th Cir. 1981)(requiring a "legislative enactment" to establish negligence per se).  As to the regulations,[13] the court finds that Bosarge

---

[13]  The Xpress may be an "uninspected" vessel such that OSHA regulations may apply to the commercial dive operations as opposed to the Coast Guard regulations.  However, substantially the same duties and responsibilities are placed upon the commercial dive operator under either regulatory scheme.  Thus a determination as to which regulations apply is not necessary to decide the issue of *per se* negligence under the Jones Act.  The OSHA regulations for post-dive procedures were submitted.  Also, the OSHA regulations require that "gauges indicating diver depth which can be read at the dive location shall be used for all dives except SCUBA" and that a "timekeeping device shall be available at each dive location", albeit without mention of timing in minutes. 29 C.F.R. § 1910.430.  Although OSHA does not appear to call for written designation of a dive supervisor, the regulations do require designation of a person-in-charge of diving operation. 29 (Continued)

Diving has met its burden to show that no violation of the regulations was causally related to Pettis suffering from decompression sickness. First, the failure to have a timepiece with the ability to record seconds is not a violation of the cited regulations. The regulations only require one timepiece and define the timepiece as one measuring time in minutes. As to the remaining regulations, Bosarge Diving complied with the cited regulations with the exception that it failed to designate the diving supervisor in writing and failed to recite each post-dive precaution. However, Bosarge Diving has met its burden of showing by clear and convincing evidence that these violations were not causally related, i.e., were not the proximate cause, of Pettis' decompression sickness. Accordingly, the court finds for Bosarge Diving on Pettis' claim of negligence per se.

C. Negligence

The seaman's employer is liable under the Jones Act "for such injury . . . resulting in whole or in part from the negligence" of the employer. 46 U.S.C. § 30104, *et seq*. (incorporating the remedies under FELA); 46 U.S.C. § 51 (FELA).

Previously, as to the duty of care, the Fifth Circuit in Spinks v. Chevron Oil Co., 507 F.2d 216, 223 (5th Cir. 1975), stated that

> "The duty owed by an employer to a seaman is so broad that it encompasses the duty to provide a safe place to work. By comparison, the seaman's duty to protect himself ... is slight."

Id. at 223 (internal citations omitted). From this, a heightened duty on the part of the employer and a "slight" duty on the part of the seaman developed:

---

C.F.R. § 1910.411(c)(1) ("(c) Designated person-in-charge. (1) The employer or an employee designated by the employer shall be at the dive location in charge of all aspects of the diving operation affecting the safety and health of dive team members.").

Initially, we note that the duty of care a shipowner owes to a seaman has traditionally been recognized to be a very high one. . . . As a corollary of this general duty, owners are held to a high degree of care in providing a safe work environment.

Dempsey v. Mac Towing, Inc., 876 F.2d 1538, 1542 (11th 1989) (internal citation omitted)

(citing Spinks v. Chevron Oil Co., 507 F.2d 216, 223 (5th Cir. 1975)). Then, in 1997 the Fifth

Circuit in Gautreaux v. Scurlock Marine, Inc., 107 F. 3d 331 (5th Cir. 1997) (en banc) discussed the

duty of care owed by the employer and the duty of care owed by the seaman to protect himself and

held that both were always held to a reasonable person /ordinary prudence standard: "[A]n

employer's duty of care always remained that of *ordinary* negligence." Id. at 335. Gautreaux

expressly overruled Spinks. (italics in original).

By ascribing to seamen a slight duty of care to protect themselves from the negligence of their employers, Spinks and its progeny, specifically Brooks, are repugnant to the principles we espouse today and are therefore overruled.

Gautreaux, 107 F.3d at 339. The court in Gautreaux also explained the confusion and conflation of

a seaman's "slight" burden of proof on causation - that the employer's negligence played even the

slightest part in causing the injury - with the phrase "slight negligence" or the like, which generated

case law holding that there was a heightened duty of care on the part of the employer and a lesser

duty of care on the part of the seaman to protect himself.

Gautreaux, 107 F.3d at 336.

However, since Dempsey is not Fifth Circuit precedent, Gautreaux did not overrule it. The

Eleventh Circuit Court of Appeals has not clarified its position, since Dempsey, on the standard to

be applied. However, the Eleventh Circuit Pattern Jury Instruction specifically cites to Gautreaux

and states as follows:

The Jones Act refers to the Federal Employers Liability Act ("FELA"), 45 USC § 51et seq., in affording recovery rights to Jones Act plaintiffs. See Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir. 1997) (en banc). Under some prior Fifth Circuit precedent binding on the Eleventh Circuit, employees under FELA only had to exercise a "slight duty of care" toward their own safety,

effectively placing a higher standard, comparatively speaking, upon the employer. See Spinks v. Chevron Oil Co., 507 F.2d 216 (5th Cir. 1975); Allen v. Seacoast Products, Inc., 623 F.2d 355 (5th Cir. 1980).

Clarifying and overruling those prior Fifth Circuit cases, the Fifth Circuit concluded that both the employer and employee are held to the same standard of care, (i.e., an employee is obligated under the FELA to act with ordinary prudence). Gautreaux, 107 F.3d at 335 (5th Cir. 1997). The Fifth Circuit has noted that "[i]n Gautreaux, we held that 'nothing in the text or structure of the FELA-Jones Act legislation suggests that the standard of care to be attributed to either an employer or an employee is anything different than ordinary prudence under the circumstances." Crawford v. Falcon Drilling Co. Inc., 131 F.3d 1120, 1125 (5th Cir. 1997) (citing Gautreaux, 107 F.3d at 338).

Pattern Civ. Jury Instr. 11th Cir., cmt. at 361 (2005).

The Pattern Jury instructions also instruct on the burden regarding causation:

However, the relaxed rule concerning the issue of causation under the Jones Act remains the same as it was before Gautreaux. Under that rule, reflected in this instruction, an employer's negligence is actionable if it "played any part, even the slightest, in producing the injury or death for which damages are sought."

Pattern Civ. Jury Instr. 11th Cir., cmt. at 362 (2005) (underlining in original). Accordingly, the court will apply the standard as set forth in Gautreaux.

The court finds that on August 24, 2006, Bosarge Diving was negligent in monitoring the depth of Pettis' dives and was negligent in its control of Pettis' ascent rate. Specifically, without consistent depth readings, the rate of ascent could not be and was not accurately judged. The failure to ascend at an appropriate rate, based on depth location, contributed to Pettis' subsequent decompression sickness on August 25, 2006. Accordingly, the court finds for Pettis on his claim of negligence.

The court may consider any contributory negligence on the part of Pettis, as "comparative negligence to mitigate the damages in proportion to the degree of [his] negligence." Bobb v. Modern Products, Inc., 648 F.2d 1051, 1056 (5th Cir. 1981)(overruled on other grounds by

Gautreaux). Pettis is has a duty "under the Jones Act to act with ordinary prudence under the circumstances," including his "experience, training, [and] education." Gautreaux, 107 F.3d at 339. Bosarge Diving has the burden to establish Pettis' contributory or comparative negligence, i.e, that he did not act with ordinary prudence. See American Dredging Co. v. Lambert, 153 F.3d 1292, 1297 (11th Cir.1998).

Pettis was engaged in a surface air supplied dive (Finding of Fact at ¶17) and Baria and Bosarge as the dive supervisor and dive tender, had total control over Pettis' depth, bottom time, and ascent rate. Bosarge Diving has not presented any evidence that Pettis failed to act with ordinary prudence based upon his experience, training or skill, in this type of dive. Therefore, the court finds that Pettis was not negligent and any damage award will not be reduced.

D.      Unseaworthiness

To allege a claim of unseaworthiness, a plaintiff must allege an injury which was caused by a defective condition of the vessel or its equipment. Michel v. Jade Marine, Inc.. 2008 WL 5382255, 3 -4 (E.D.La. December 22, 2008) ("A vessel's unseaworthiness may arise from various circumstances, including defective gear, appurtenances in disrepair, an unfit crew, and improper method of loading cargo, or an insufficient number of workers assigned to perform a shipboard task.").

The plaintiff's employer "has an absolute, nondelegable duty to ensure that its vessels are seaworthy." Deakle v. John E. Graham & Sons, 756 F. 2d 821, 825 (11th Cir. 1985). The Eleventh Circuit has explained the warranty of seaworthiness as follows:

> The warranty of seaworthiness is, as the appellant contends, an absolute duty, but it does not obligate the owner to furnish an accident-free vessel. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941, 948-49 (1960). The question is one of reasonable fitness for the intended use of the vessel and her appliances. Id., 362 U.S. at 550, 80 S.Ct. at 933, 4 L.Ed.2d at 948-49; Little v. Green, 428 F.2d 1061, 1065 (5th Cir. 1970), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970). We noted in Haughton v. Blackships, Inc., 462 F.2d 788 (5th

Cir. 1972), "that 'a seaman is not absolutely entitled to a deck that is not slippery. He is absolutely entitled to a deck that is not unreasonably slippery.' " 462 F.2d at 789 (quoting Colon v. Trinidad Corp., 188 F.Supp. 97, 100 (S.D.N.Y. 1960)). . . .

Johnson v. Bryant, 671 F.2d 1276, 1279 -1280 (11th Cir. 1982) (footnote omitted).

"Unseaworthiness, like Jones Act negligence, can be the *per se* result of a regulatory violation. However, a crucial distinction between the two claims is the differing standard of causation required to find liability. While Jones Act negligence is a legally sufficient cause of injury if it played any part, no matter how small, in bringing about the injury, the plaintiff must meet a more demanding standard of causation in an unseaworthiness claim. Unlike the 'featherweight' standard of causation in a Jones Act claim, the standard in an unseaworthiness claim is 'proximate cause in the traditional sense.'" Smith v. Trans-World Drilling Co., 772 F.2d 157, 162 (5th Cir. 1985) (citations omitted) (footnote omitted).

In regard to proximate cause, plaintiff must show that the "unseaworthiness played a substantial part in bringing about or actually causing the injury and that [] the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Id. In that regard, the Eleventh Circuit explains as follows:

> In Spinks we adopted a "substantial factor" standard of causation for "unseaworthiness" claims brought under general maritime law. Jones Act claims, on the other hand, involve a less demanding standard of causation: "causation may be found if the defendant's acts or omissions played any part, no matter now small, in bringing about the injury."

McClow v. Warrior & Gulf Nav. Co., 842 F.2d 1250, 1251 (11th Cir. 1988); Comeaux v. T.L. James & Co., 702 F.2d 1023, 1024 (5th Cir.1983) ('The standard required to prove causation as a result of the vessel's unseaworthiness is more demanding than that for recovery under the Jones Act, and requires proof of proximate causation in the traditional sense."); see also Barlas v. United States, 279 F.Supp.2d 201, 208 (S.D.N.Y. 2003) ("A seaman must show that an unsafe condition on the vessel caused his injury; dispensing with the need to prove that some 'fault' led to this condition

does not dispense with the need to establish that there was one. [] The lower standard of causation familiar in Jones Act cases does not apply, and thus the plaintiff must show that the defective condition was a 'substantial factor' in causing his injury.") (internal quotations and citations omitted).

Applying the standard of causation applicable to a claim of unseaworthiness, that the plaintiff must show that the unsafe condition was a substantial factor in causing his injury, the court finds that Pettis has failed to establish that any unsafe condition of the Xpress was a substantial factor in causing his decompression sickness on August 25, 2006.

Under the general maritime law, a vessel owner has a duty to provide a vessel that is reasonably fit for its intended purpose and that includes a crew that is reasonably fit. The vessel owner is not required to provide an accident free vessel or a perfect crew. The Supreme Court has stated that the standard was "not perfection, but reasonable fitness." Mitchell v. Trawler-Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926 (1960). The evidence establishes that Bosarge and Baria were skilled and experienced as dive tenders and certified commercial divers and as such were reasonably fit for their work aboard the Xpress. See Britton v. U.S.S. Great Lakes Fleet, Inc., 302 F.3d 812, 818 (8th Cir. 2002) ("Examples of conditions that can render a vessel unseaworthy include . . . unfit crew. . . .") (citing Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 499, 91 S.Ct. 514 (1971)). That Baria and Bosarge were negligent in conducting the specific dives at issue does not render the Xpress unseaworthy. See Domingue v. Offshore Service Vessels, LLC, 2009 WL 3254147, 4 (E.D. La. October 7, 2009) ("A vessel's condition of unseaworthiness might arise from circumstances such as defective gear, appurtenances in disrepair, or an unfit crew. [ ] An isolated act of negligence does not establish unseaworthiness." (citing Usner, 91 S.Ct. at 517); Dover Barge Co. v. Tug Crow, 642 F.Supp.2d 266, 275 (S.D.N.Y. 2009) ("A single act of operational negligence, however, will not suffice to create an unseaworthy condition. Operational

negligence must be 'pervasive or repeated frequently for it to rise to the level of an unseaworthy condition.'") quoting <u>Fed. Ins. Co. v. PGG Realty, LLC</u>, 538 F.Supp.2d 680, 697 (S.D.N.Y. 2008). Accordingly, the court finds for Bosarge Diving as to Pettis' unseaworthiness claim.

V.    <u>Damages</u>

Pettis has requested damages for pain and suffering, future wages and future medical expenses.  The court finds that Pettis is not entitled to recover future wages because he has failed to show that he is unable, as a result of the August 25, 2006 episode of decompression sickness, to earn comparable wages. The court also finds that Pettis is not entitled to recover future medical expenses because he has failed to prove that he has any residual disability as a result of the August 25, 2006 episode of decompression sickness.  However, the court finds that Pettis is entitled to recover $10,000 for the pain suffered on August 25, 2006.

DONE and ORDERED this the 1st day of November, 2010.

<u>/s/ Kristi K. DuBose</u>
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE